UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ROBERTO CORRAL,

              Plaintiff,

                 -against-

ARROW ELECTRONICS, INC.,

              Defendant.
------------------------------------------------------------------X

**REPORT AND**
**<u>RECOMMENDATION</u>**

16-CV-04636 (JMA) (JMW)

**A P P E A R A N C E S:**

**Roberto Corral**
181 Lakebridge Drive N
Kings Park, NY 11754
*Plaintiff Appearing Pro Se*

Adam Granek Guttell, Esq.
John J. Porta, Esq.
Henry Scott Shapiro, Esq.
**Jackson Lewis P.C.**
58 South Service Road, Suite 250
Melville, NY 11747
*Attorneys for Defendant*

Jennifer Y. Davis, Esq.
**Jackson Lewis P.C.**
666 Third Avenue, 29th Floor
New York, NY 10017
*Attorney for Defendant*

**WICKS,** Magistrate Judge:

       Plaintiff Roberto Corral ("Plaintiff" or "Corral") commenced this action against his

former employer Arrow Electronics, Inc. ("Defendant" or "Arrow"), alleging violations under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 and the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12112-12117.  (*See* ECF No. 1.)  Specifically, he alleges claims that: (1) he was discriminated against based upon his national origin (Ecuadorian) and purported disability (occasional breathing problems and acid reflux); (2) that Defendant failed to accommodate his claimed disability; and (3) retaliated against him.  (*Id.*); (*see also* ECF No. 152.)

Discovery is now complete and before the Court on referral from the Hon. Joan M. Azrack (*see* Electronic Order dated Feb. 28, 2024) is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (ECF No. 145), which is opposed by Plaintiff (ECF No. 151).[1]  For the reasons stated herein, the undersigned respectfully recommends that Defendant's motion for summary judgment be **GRANTED**.

## BACKGROUND

### A. Factual Background

The following facts are drawn from the parties' Local Rule 56.1(a) Statements (ECF No. 152) and are uncontested unless otherwise noted.[2]

---

[1]  Although Plaintiff did not file a memorandum in opposition to Defendant's motion, he filed a 121-page counterstatement to Defendant's 56.1 statement and attached various documents as support for his position.  (ECF No. 151.)  Plaintiff also did not refute 115 out of the 185 statements in Defendant's 56.1 statement of undisputed material facts.  (*See generally* ECF No. 151.)  In accordance with EDNY Local Rule 56.2, the required notice to *pro se* Plaintiff was served (ECF No. 150).

[2] Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement throughout this Report and Recommendation means that the Court has deemed the underlying factual allegation undisputed. Any citation to a Rule 56.1 statement incorporates by reference the documents cited in it. Where relevant, however, the Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal.  *See Stewart v. Fashion Inst. of Tech.,* No. 18-cv-12297 (LJL), 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("'[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record.'") (quoting *Knight v. N.Y.C. Hous. Auth.*, No. 03-cv-2746 (DAB), 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."). Further,

*1.  Defendant's Place of Employment and Plaintiff's Supervisor*

Arrow is "a global provider of products and services to both industrial and commercial users of electronics, and provides innovative technology solutions to medical transportation, and telecommunications markets among a range of others."  (ECF No. 148 at 1) ("D'Alessandro Declaration").

In June 2013, Richard D'Alessandro assumed the title of Senior Manager of the Collaboration Infrastructure & Unified Communications Team at Arrow and supervised Plaintiff around June of 2013.  (*Id.*); (ECF No. 147-3 at 25) ("Pltf. Dep. Tr.").

*2.  Plaintiff's Position with Defendant and Tasks*

Plaintiff began working for Arrow as a Network Security Engineer on November 15, 2004.  (ECF No. 152 at ¶ 7.)  He was responsible for "supporting the development of certain infrastructures and technologies supported by the Collaboration team."  (*Id.* at ¶ 9.)

Among Plaintiff's day-to-day duties was to manage the CA Service Desk tickets[3] to "ensure[] Arrow's internal customers have the support they need to complete their job functions effectively and efficiently."  (D'Alessandro's Declaration at 1.)  The CA Service Desk tickets were generated by internal employees who submitted incident reports to the Helpdesk for assistance.  (ECF No. 152 at ¶ 11.)  The Helpdesk was then responsible for distributing the tickets to Arrow's departments, including the Collaboration Team, so they can resolve the

---

to the extent a party improperly interjects arguments and/or immaterial facts in response to facts asserted by the opposing party, and does not specifically controvert such facts, the Court disregards those statements.  *See McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020) (quoting *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012)).

[3] CA Service Desk tickets "are cases that the helpdesk receive[s] from customers or other Arrow employees. They are entered into a system that keeps track of the…case number, the username, and the program."  (Pltf's Dep. Tr. at 7-8.)

respective issues.  (*Id.*; *see also* Pltf's Dep. Tr. at 8.)  There were also non-CA requests which did not get documented but employees like Plaintiff would still be required to resolve those issues.  (ECF No. 152 at ¶ 12.)

Plaintiff was also responsible for other administrative tasks like timely submitting his own summary of time spent on projects or tasks from week to week into the system known as Clarity.  (*Id.* at ¶ 10.)  Inputting this information was necessary for the Team to allocate resources and costs accordingly.  (*Id.*)  When an employee wanted to take time off from work, he would have to track it in the Defendant's payroll software.  (*Id.* at ¶ 13.)

### 3. *Complaint Against Russo*

Plaintiff reached out to his Human Resources ("HR") representative Christopher Gray to complain about Collaboration Team Director, Robert Russo's behavior, stating that his "conduct was not appropriate."  (Pltf's Dep. Tr. at 12.)  In a meeting on May 10, 2013, Russo and Plaintiff discussed the timeliness of certain tasks which Plaintiff attributed to technical difficulties.  (*Id.* at 13.)  Plaintiff described Russo's conduct as "overly offensive and disregarded the quality, detailed and dedicated work" that he performed.  (ECF No. 147-10 at 2) (email between Plaintiff and Christopher Gray).

### 4. *Treatment While Employed with Defendant*

While working at Arrow, Plaintiff alleges that he was forbidden from:

- Speaking with executives which affected his performance because at times he needed to speak with them;

- Bringing his work laptop to work meetings; and

- Leaving his home or office unless there were extenuating circumstances when he was on-call, even if there was no work to be done.

(ECF No. 1.)  He states that his other co-workers who performed equivalent functions were not treated in this manner.

According to Plaintiff, there are several employees that enjoyed more favorable treatment than he did.  First, David Neese and Brian Black, both Infrastructure Engineer IIs, from the "USA" and do not have a disability were able to take sick days off, communicate with executives, bring their work laptops in to meetings, transfer projects to others, and go out for lunch while on-call.  (ECF No. 1 at 10.)  In addition, John Butera, Principal Engineer from the "USA" and does not have a disability allegedly received more flexible deadlines for the same project Plaintiff was working on.  (*Id.*)

Defendant, however, sharply disputes that any other employees were given "favorable deadlines," since "timelines are set by business needs and deliverables."  (D'Alessandro Declaration at 3.)

### 5. *National Origin Discrimination*

Plaintiff seemingly points to a few instances of discrimination based on his Ecuadorian National Heritage.  First, he states that Bob Ragusa, another employee under D'Alessandro, directed a "gross Mexican word with sexual connotations" at Plaintiff each time he saw him. (ECF No. 152 at ¶ 8.)  Second, he states that Russo compared him to another employee.  (*Id.*) And finally, Russo mocked Plaintiff in a congested voice and D'Alessandro sometimes laughed along.  (*Id.*)

### 6. *Disability Discrimination*

Plaintiff states that Defendant discriminated against him based on his "nasal congestion, acid reflux, asthma and related time off."  (ECF No. 1 at 10.)  D'Alessandro in turn states that it was only in August 2014 that Plaintiff disclosed that acid reflux impacted his job performance.

(D'Alessandro Declaration at 3); (*see also* ECF No. 147-28 at 2-3) (email exchange between Steven Vogel from HR and Plaintiff regarding his inability to complete a task due to his acid reflux and requesting supporting documentation).

  7. *Failure to Accommodate*

  Per the Employee Handbook (ECF No. 147-5 at 5), Arrow was to "provide reasonable accommodations as required by [the ADA] to any qualified employee with a disability."  Further, the handbook states:

> Qualified employees with disabilities may continue in their positions as long as they are able to perform the essential functions of their job with or without reasonable accommodations, as denied by state and federal laws, medical evidence indicates the condition is not a direct threat to themselves or to others, and there is not otherwise an undue hardship on the business.

(*Id.*)

  Plaintiff alleges that he asked his employer for changes due to his disability on September 3, 2014.  (ECF No. 1 at 11.)  Specifically, he states that he requested to Steven Vogel, Manager of HR, and D'Alessandro that he get:

- Clean air
- Reduce the number of work alerts he received at night which disrupted his sleep and
- Allow one to two hours for health symptoms to subside related to acid reflux, sinus, and asthma

(*Id.*)  As a result he received FMLA leave approval for one year from September 3, 2014 to September 2, 2015 for one day per week.  (*Id.*); (*see also* ECF No. 1 at 15) (FMLA approval letter).

  Overall, Defendant claims that it made accommodations for Plaintiff every time he requested one.  He had first asked to take some time off to take his son to the doctor.  (Pltf. Dep. Tr. at 71.)  He was told by D'Alessandro to request the time from HR.  (*Id.*)  Plaintiff

acknowledged that he cancelled his son's appointment after D'Alessandro did not approve it although he was to go to HR as instructed.  (*Id.*)

In a second instance, on Thursday, September 11, 2014, Plaintiff emailed D'Alessandro informing him of a doctor's appointment on Monday, September 15, 2014 in which he would be leaving by 8:00 AM and returning by 3:00 PM.  (ECF No. 151-38.)  He asked D'Alessandro whether he could work from home or take the day off.  (ECF No. 1 at 17.)

D'Alessandro responded:

Does this mean you will be coming into the office and working for 2 hours at the end of the day only?

(ECF No. 151-38.)  Plaintiff replied:

On Monday I have a procedure, I have checked again with the Doctor's office. Preferably I stay at home but I can definitely work from home. I'll be back home from the Hospital by 10:30 am. So, it is up to you if I work (Preferred) or if you want me to take the day off. Thanks.

(*Id.*)

Plaintiff did not receive a response from D'Alessandro, so he opted to work from home, and worked for 5 hours between 7:30 AM to 6:30 PM and for 3 hours from 8:00 PM to 11:00 PM.  (ECF No. 1 at 17.)  His only opposition is that he was denied the ability to start his day later, i.e., after he returned home from the procedure. (Pltf. Dep. Tr. at 76-77.)  According to Plaintiff, he was still expected to complete his standard duties despite his medical procedure.  He says however D'Alessandro told him to remove his time worked in the evening and he was essentially not paid for those hours.  (ECF No. 152 at ¶ 15.)

Defendant alleges that Plaintiff did not take off for the hours he was out of the office for the surgery and worked past his daily end time for the day.  D'Alessandro informed Plaintiff that "the fact that you worked late that night is not at your discretion to offset the time during the day

that you were unavailable. That would have to be a discussion during which we would have to mutually agree on the approach."  The three hours he worked past 5:00 PM was converted to three hours of vacation.  (ECF No. 152 at ¶ 118.); (*see also* ECF No. 147-19 at 2) (emails between Plaintiff and D'Alessandro on October 7, 2014); (ECF No. 147-4 at 8, 11) ("D'Alessandro Dep. Tr.") (stating that only the work from after the procedure was approved, "not to adjust the start and end[] time of [his] work day").

In a third request, Plaintiff requested accommodations for his back pain on January 2, 2015 and could not commute to work.  (Pltf. Dep. Tr. at 79.)  These issues were not the basis for his FMLA approved leave he initially received.  (*Id.*)  Defendant gave him the option to take a sick day but he chose to work from home to appease management.  (*Id.* at 80.)

### 8. Plaintiff's Work Performance

Defendant cites Plaintiff's continued failure to improve especially given the comments in his past evaluations[4] and his Performance Improvement Plans ("PIPs").  Plaintiff claims that he received scores of "Met Expectations Successfully" or "Exceeded Expectations" from 2005 to 2012.  (ECF No. 152 at ¶ 14.)  However, it was only when D'Alessandro became his manager, that his scores dropped below average in 2013 and 2014.  (*Id.*)  Below is a summary of Plaintiff's Employee Performance Reviews ("EPRs") and PIPs from 2011 to 2014:

| Document | Rating | Areas for Improvement |
|---|---|---|
| 2011 | 3.3 out of 5.0 | Plaintiff needed to be more flexible about non-engineering assignments and be open to understanding management decisionmaking.  He was encouraged to better prioritize and pace out his assigned tasks accordingly in order to meet the committed deadlines and "have more of a sense of urgency for certain types of requests and service-related issues including the management for the Collaboration CA Service Desk queue." (ECF No. 152 at ¶¶ 19, 21.) |

---

[4] Notwithstanding, Plaintiff was often credited for positive work conduct too.  (*See e.g.* ECF No. 151-28) (comment from Russo); (ECF No. 151-29) (comment from Guy Gordon, another employee); (ECF No. 151-30) (positive comments from other employees); (ECF Nos. 151-31, 151-32, 151-33) (statements from Sebastian Karg, Frank Petereins, and Chris Warne commenting on Plaintiff's work); (ECF No. 151-48) (commendations from D'Alessandro in November 2013).

| 2012[5] | Achieved Expectations | Plaintiff's time management skills and completion of required administrative tasks including the management of CA Service Desk tickets and timely submission of his time sheets—both issues mentioned in 2011.  (ECF No. 152 at ¶ 28.)  Other issues included his inability to multi-task and parallel process, tracking deadlines, and the need to take responsibility for his actions.  (*Id.* at ¶ 35.) |
| 2013 PIP | | Defendant even followed up to discuss Plaintiff's failure to meet deadlines and ultimately put Plaintiff on a PIP in May 2013.  (*Id.* at ¶ 39.)  His 2013 PIP areas for improvement included: multitasking, meeting deadlines, CA service desk and time sheets, and inability to follow management's directives.  (*Id.* at ¶ 45.)  The PIP even recommended a "bi-weekly check in with Russo" to evaluate whether Plaintiff progressed.  (*Id.* at ¶ 51.)  If Plaintiff failed to improve however, he was on notice that his employment cold be terminated.  (*Id.* at ¶ 52.) |
| 2013 | Achieved Expectations | The same issues were noted as in the 2011-2012 EPRs and his 2013 PIP—time management/ability to multitask, following management's directions, completion of administrative tasks, including addressing CA tickets timely and closing his projects/tasks before a deadline (*Id.* at ¶¶ 56, 68). |
| 2014 PIP | | This March 2014 PIP reiterated all the same issues from his 2011, 2012, 2013 EPRs and his May 2013 PIP: time off and time management[6]; CA Service Desk and Clarity Time Sheets; inability to follow managerial direction; and timesheets.  (*Id.* at ¶ 72.)  He was again put on notice that if he failed to improve, he could be terminated.  (*Id.* at ¶ 71.) |
| 2014 | | His 2014 performance goals were the same as prior years and included: management of CA Service Desk Tickets, timely submission of timesheets; and meeting deadlines.  (*Id.* at ¶¶ 86-87.)  Indeed on July 10, 2014 D'Alessandro emailed Plaintiff informing him that he had 54 open CA tickets but Plaintiff did not respond.  (*Id.* at ¶ 88). |

D'Alessandro described Plaintiff's skill level as "adequate" and stated he had performance issues in areas such as "time management skills, inability to follow management's directives," "meeting deadlines, managing more than one project at a time, and completing administrative tasks."  (D'Alessandro Declaration at 2); (ECF No. 152 at ¶ 44.)  Plaintiff, however, disputes this stating that he had "excellent technical skills," was able to multitask on various things, and often completed projects on or before the deadline.  (ECF No. 152 at ¶ 17.)

---

[5] Arrow changed its EPR software from numerical points in 2012.  (ECF No. 152 at ¶ 25.)

[6] Plaintiff failed to submit a status update regarding an IronPort replacement which involved the "remote installation of a device to process emails" for a Mexican company.  (ECF No. 152 at ¶ 60.)  Instead, he submitted the project plan eight days after the deadline.  (*Id.* at ¶ 61.)  He could not explain why he missed the deadline.  (*Id.*)

He further states that he worked more hours on average than any other employee that reported to D'Alessandro and Russo.  (*Id.*)

Plaintiff did not seek approval for a production change for a "Mobile Iron" project. (D'Alessandro Declaration at 2.)  He further failed to follow managerial instructions and "applied a security policy change without first testing it," which prompted users to re-enter their passwords for their devices to sync to emails calendars, and contacts.  (*Id.* at 2-3.)  This was especially harmful for Arrow because it resulted in a significant amount of CA Service Desk tickets.  (*Id.* at 3.)  Plaintiff, however, states that he followed all of D'Alessandro's directions on this and was told there were no downsides or negative impacts for users.  (ECF No. 152 at ¶ 97.) Indeed, he says that re-entering the user's passwords is not unusual.  (*Id.* at ¶ 98.)

On December 2, 2014, Plaintiff was instructed to work on open service desk tickets. (*Id.* at ¶ 122.)  The following events occurred:

- Plaintiff met with D'Alessandro around 9:00 AM and discussed his work on the following priority issues: email delays; digital certificates; MobileIron administrative access; and the need for Plaintiff to car pool with a co-worker so he can get his car from the mechanic (*Id.*);

- D'Alessandro sends an email to the Collaboration Team at 10:28 AM instructing them to work on service desk tickets, although the email arguably did not include a priority label (*Id.*);

- Plaintiff met with Russo to discuss his current tasks and assigned him an additional task to reboot two failing servers, but Russo did not mention making the CA ticket task a priority (*Id.*);

- Russo sends an email with the priority label at 2:21 PM, while Plaintiff is away from his desk, stating that working on the CA tickets must be closed out by 5:00 PM (*Id.* at ¶ 123); (Pltf. Dep. Tr. at 63);

- Russo sent a follow up email at 4:50 PM with the priority label further advising the Team of the CA service desk tickets task. (ECF No. 152 at ¶ 124.)

- Plaintiff left at 5:02 PM to pick up his car at the mechanic and informed D'Alessandro that most of the tickets assigned to him were "not found" (*Id.* at ¶ 125);

- Plaintiff worked on his tasks, including the CA service tickets, later that evening.  (*Id.* at ¶ 127.)

Plaintiff states that neither D'Alessandro nor Russo indicated to him in their meetings that the CA service desk tickets were priority for the day.  (*Id.* at ¶ 123.)  Further, he states that Russo did not send the priority email to his paging Collaboration account which was set up for priority situations like this one.  (*Id.*)  He says that the fact that he was away from his desk for a meeting with Russo coupled with the fact that he was working on other priority tasks, he did not receive the email regarding the CA service tickets.  (*Id.*)  Plaintiff further maintains that if the matter were a priority and sent via the correct Collaboration email, he would have switched gears and worked on the CA service tickets.  (*Id.* at ¶ 128.)

Defendant alleges that Plaintiff was "the only member of the Collaboration team who failed to comply with [D'Alessandro's] directions and address [Plaintiff's] CA Service Desk tickets."  (D'Alessandro Declaration at 3.)  Notably, in an email from D'Alessandro to Corral at 8:21 PM on December, 2, 2014, D'Alessandro states "[i]n our conversation this morning we agreed that the tickets should be your priority today and I gave you guidance on the pattern of issues we experienced yesterday to help you efficiently work on these tickets."  (ECF No. 147-24 at 2) (email exchange between plaintiff and D'Alessandro concerning CA Service Desk Tickets).  Plaintiff responded that he "understood."  (*Id.*)  This means that D'Alessandro did in fact emphasize the importance of prioritizing the CA Service Desk ticket task.

### 9. *Plaintiff's Final Warning and Subsequent Termination*

Plaintiff was issued a final warning on October 28, 2014[7] based on his underperformance and failure to improve.  (ECF No. 152 at ¶ 99.)  All of the issues from his 2011, 2012, and 2013

---

[7] One comment that is particularly questionable but has minimal bearing on this case is Russo's comment that he did not want to give Plaintiff advanced notice to prepare or create a rebuttal case in relation to his

EPRs as well as his 2013 and 2014 PIPs and 2014 performance goals were mentioned in this final warning letter. (*Id.* at ¶ 100.) The issues mentioned included: failure to meet deadlines, failure to follow management's directives; untimely submission[8] and falsification of timesheets. (*Id.* at ¶ 101.) Further, Plaintiff failed to meet three deadlines including: testing on a feature by August 29, 2014; failing to take the lead on a delayed email issue which led to D'Alessandro's prompting for a status update nearly a month later (ECF No. 151-9) (email exchange between D'Alessandro and Corral dated September 19, 2014); and failing to test a Mobile Iron upgrade in September 2014 which resulted in mobile device registration failures. (ECF No. 152 at ¶ 102); (Pltf. Dep. Tr. at 50.) Plaintiff however, states that the email delays were resolved by the end of August and the delays occurring in September were because of a separate issue even after the servers were rebooted. (ECF No. 152 at ¶ 102.) According to Plaintiff, the delays only recurred as a result of his not getting to the "root cause" of the problem as he had promised. (*Id.*); (*see also* ECF No. 151-5) (email exchange between D'Alessandro and Corral regarding root cause of email delays). He states that he provided sound recommendations to D'Alessandro to offset these delays but management did not heed his advice. (ECF No. 152 at ¶ 102.)

When Plaintiff requested a follow-up meeting to discuss the letter's contents, he says that D'Alessandro told him not to send Pete Crescenzo, the Vice President of Arrow, a meeting invite

---

final warning letter. (ECF No. 152 at 141); (*see also* ECF No. 151-45 at 2) (email exchange between Russo and DeVilliers regarding not giving Plaintiff advance notice). Nor does Defendant dispute the statement itself. Defendant only opposes the statement asking the Court to find that Russo was not concealing facts. (ECF No. 152 at 141.) Nonetheless, Russo's comments do not change the outcome of this case.

[8] Plaintiff states that D'Alessandro agreed to allow Plaintiff to submit his timesheets on Monday instead of Friday's afternoon. (ECF No. 152 at ¶ 104.) He says D'Alessandro wanted to "break this arrangement" and Plaintiff reverted back to submitting his timesheets Friday afternoon. (*Id.*); (ECF No. 151-40 at 2) (email exchange between D'Alessandro and Plaintiff in which D'Alessandro states that it was a "onetime exception" to allow Plaintiff to submit his timesheet on a Monday rather than a Friday).

and D'Alessandro told Plaintiff to stop talking during a meeting when Plaintiff wanted to clarify the statements. (*Id.* at ¶ 111.) He was later told not to speak with any executive in Arrow. (*Id.*)

Plaintiff had until November 4, 2014 to state how he planned to resolve these deficiencies. (ECF No. 154-2 at 4.) He was warned that failure to correct these deficiencies would result in termination. (ECF No. 152 at ¶ 107.) However, Plaintiff only submitted a response to the final warning letter on November 5, 2024. (*Id.* at ¶ 108); (ECF No. 147-22 at 3) (plaintiff's response to the final written warning letter). In fact Plaintiff did not refute majority of D'Alessandro's comments. (ECF No. 152 at ¶ 112, 114.) Notably, Plaintiff did not raise any issues of discrimination in his November 5th response. (*Id.* at ¶ 121); (Pltf. Dep. Tr. at 57) (Q: "Did you send a separate communication to human resources after you received this final written warning about discrimination and/or retaliation?" A: I don't recall.").

On December 5, 2014, D'Alessandro recommended to HR that Plaintiff be terminated upon review of his performance history and PIPs. (D'Alessandro Declaration at 3); (ECF No. 147-25 at 2) (email from D'Alessandro to DeVilliers regarding Plaintiff's termination). In making this decision, D'Alessandro cited Plaintiff's failure to prioritize CA help desk tickets. (ECF No. 152 at ¶ 131.) HR agreed with D'Alessandro's recommendation and Plaintiff was subsequently fired on January 8, 2015 while holding the position of Senior Infrastructure Engineer III. (D'Alessandro Declaration at 3.); (ECF No. 1 at 9.)

### B. **Relevant Procedural Background**

On November 3, 2015, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunities Commission ("EEOC") alleging that Defendant discriminated and retaliated against him based on his national origin and disability in violation of Title VII and the

ADA. (ECF No. 152 at ¶ 137.) On May 11, 2016, the EEOC stated that it was "unable to conclude that the information obtained establishes violations of the statutes." (ECF No. 1 at 6.)

Plaintiff commenced this suit on August 10, 2016 (ECF No. 1). Magistrate Judge Steven I. Locke[9] held an initial conference with the parties and entered into a scheduling order (ECF No. 16.) Following this, the parties entered mediation (Electronic Order dated Oct. 24, 2018), which was ultimately unsuccessful in resolving the dispute. (Electronic Order dated Mar. 14, 2019.)

Throughout, the Court ruled on several motions to compel (ECF Nos. 56, 57, and 63) as well as several motions to extend the discovery deadline (ECF Nos. 67, 69, 70, 72, 75, 77, 91). This summary judgment motion followed. Both parties requested several extensions of the briefing schedule which the Court graciously granted *sixteen* times—with majority of these extensions coming from Plaintiff and Defendant requesting an extension for their reply given Plaintiff's extension to serve the opposition.[10] On February 5, 2024, the parties finally bundle-filed their summary judgment motion papers. (ECF Nos. 145-155.) On February 28, 2024, Judge Azrack referred the motion to the undersigned for a report and recommendation. (Electronic Order dated Feb. 28, 2024.)

## C. **The Parties' Contentions**

As can be gleaned from Plaintiff's counterstatement, he alleges that his purported bad job performance was a pretext to terminate him based on his national origin and discrimination. (ECF No. 152 at ¶ 2.) Per the Complaint, he claims that he was (1) discriminated against based

---

[9] The case was transferred to the undersigned on May 13, 2021. (*See* Electronic Order dated May 13, 2021.)

[10] (*See* Electronic Orders dated Oct. 3, 2022, Nov. 23, 2022, Dec. 14, 2022, Jan. 25, 2023, Feb. 24, 2023, Mar. 3, 2023, Mar. 23, 2023, Apr. 20, 2023, May 11, 2023, May 30, 2023, June 23, 2023, July 30, 2023, Sept. 19, 2023, Oct. 6, 2023, Oct. 13, 2023, and Nov. 27, 2023.)

on his national origin and disability; (2) not accommodated for his disability; and (3) retaliated

against in response to past complaints.[11]  The national origin discrimination is based on Ragusa's

statements to Plaintiff; Russo's comparison of Plaintiff to another Hispanic employee; and

Russo's mocking of Plaintiff's accent and his nasal congestion.  (*Id.* at ¶¶ 140-142); (*see also*

Pltf. Dep. Tr. At 29-30.)

Defendant however, states that Plaintiff's Title VII discrimination claim based on his

national origin fails because Plaintiff has not established that Defendant's reason to terminate

Plaintiff was discriminatory.  (ECF No. 146 at 8.)  Furthermore, Defendant has proffered a

legitimate, non-pretextual reason for terminating Plaintiff—his poor performance which was

emphasized to him in several EPRs and PIPs.  (*Id.*)

Plaintiff also alleges that Defendant violated the ADA when they failed to provide him

with a work-schedule accommodation for his hand surgery or otherwise failed to prove that

making such an accommodation would result in a hardship to Arrow.  (ECF No. 152 at ¶ 104.)

However, Defendant argues that Plaintiff's other claims fail because he only generally states that

he was terminated based on his purported disability.  (ECF No. 146 at 24-25.)  His failure to

accommodate claim fails because his purported disability is not recognized under the ADA;

accommodations for his son's appointment are not covered under the ADA; and Defendant

provided Plaintiff with all reasonable accommodations he sought.  (*Id.* at 25-28.)

Plaintiff alleges he was retaliated against based on a complaint he made combating

Russo's tight deadlines.  Defendant states that Plaintiff's retaliation claim under Title VII and the

ADA likewise fail because there is no protected activity and even if there were, it is too remote

---

[11] Plaintiff also alleged a failure to promote and unequal terms and conditions of his employment but neither of these were detailed in his counterstatement to Defendant's 56.1 statement and are not analyzed by the undersigned. (*See generally* ECF No. 151.)

in time to constitute evidence of retaliation; the protected activity was made after Defendant had placed him on the first PIP; and Plaintiff does not provide controverting evidence regarding Defendant's reasons for termination.  (ECF No. 146 at 28-30.)

## THE LEGAL FRAMEWORK

In order to obtain summary judgment, the movant must demonstrate there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).  Once the movant meets its initial burden, the burden shifts and the nonmovant may defeat the motion only by adducing evidence of specific facts that raise a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002).

"The Court is to believe the evidence of the non-movant and draw all justifiable inferences in her favor, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts."  *Sosa v. New York City Dep't of Educ.*, 406 F. Supp. 3d 266, 268 (E.D.N.Y. 2019) (internal citations omitted).  The role of the court at the summary judgment stage is not to *resolve* disputed issues of fact, but merely undertake an analysis to *identify* whether triable issue of fact exist. *See Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021). That is, the court's function is "issue-finding," not "issue-resolution." *Carolina Cas.*

16

*Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)).  *Au fond*, the court's role is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (citing *Anderson*, 477 U.S. at 248 and *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).

Where, as here, "a *pro se* litigant is involved, although the same standards for summary judgment apply, the *pro se* litigant should be given special latitude in responding to a summary judgment motion." *Laster v. Mancini*, No. 07-CV-8265 (DAB), 2013 WL 5405468, at *2 (S.D.N.Y. Sep. 25, 2013) (internal quotation marks omitted).  It is well settled that *pro se* papers are held "to less stringent standards" than those applied to papers drafted by lawyers.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (applying a less stringent standard to a *pro se* pleading); *see also Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) ("We liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." (internal quotation marks and citations omitted)).

Nonetheless, a *pro se* party is required to follow the requisites of Rule 56.1.  *Id.* at 2; *see also U.S. v. Pugh*, 717 F. Supp. 2d 271, 284 (E.D.N.Y. 2010) ("Nevertheless, proceeding *pro se* does not relieve the non-movant from the usual requirements of summary judgment.").  Simply proceeding *pro se* "does not exempt a party from compliance with relevant rules of procedural and substantive law" nor does it "vitiate the requirement that triable issues of fact must be raised in order to defeat a summary judgment motion." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (quotation marks and citation omitted); *Miller v. New York City Health Hosp. Corp.*, No. 00-CV-

140 (PKC), 2005 WL 2022016, at *3 (S.D.N.Y. Aug. 22, 2005) (citation omitted).  Thus, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991)).

It is within this framework, that the undersigned considers the parties' submissions.

## DISCUSSION

### A. Plaintiff's Claim of Discrimination under Title VII

Plaintiff alleges that he experienced discriminatory treatment based on his Ecuadorian nationality.  "Title VII prohibits an employer from discriminating against any individual with respect to 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.'"  *Haggood v. Rubin & Rothman, LLC*, No. 14-cv-34L (SJF) (AKT), 2014 WL 6473527, at *7 (E.D.N.Y. Nov. 17, 2014) (citing 42 U.S.C. § 2000e-2(a)(1)).  Employment discrimination cases brought under Title VII - where a plaintiff alleges disparate treatment without direct evidence of discrimination - are analyzed under the *McDonnell Douglas* three stage, burden shifting framework.  *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 82-83 (2d Cir. 2015) (citation omitted). A plaintiff establishes a *prima facie* discrimination case by showing that "(1) []he is a member of a protected class; (2) []he is qualified for h[is] position; (3) []he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination."  *Id*. (citations omitted).  The defendant-employer then has the burden to show a legitimate, nondiscriminatory reason for the disparate treatment, and if articulated, the burden shifts back to plaintiff to show the employer's reason was pretext for discrimination.  *Id*.  "The *prima facie* case under

*McDonnell Douglas*, however, is an evidentiary standard, not a pleading requirement." *LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 401 (S.D.N.Y. 2013) (internal quotation and citation omitted).

Here, Arrow states that Plaintiff cannot establish the second and fourth prongs of discrimination—that he was qualified for his position and that the circumstances demonstrate an inference of discrimination. Both prongs are analyzed below.

### 1. Prong Two: *Qualification for the Position*

The "ultimate inquiry [for the second prong for a discrimination claim] is whether the performance meets his employer's legitimate expectations." *Williams v. Alliance Nat'l,* No. 98-CV-7984 (RCC), 2001 U.S. Dist. LEXIS 2904, at *14 (S.D.N.Y. Mar. 19, 2001) (internal citations omitted). To be qualified for a position, a plaintiff must satisfy the "criteria the employer has specified for the position." *Scé v. City of New York*, No. 20-cv-3954, 2022 U.S. App. LEXIS 5352 (2d Cir. Mar. 1, 2022). Courts typically look to whether the plaintiff shows "satisfactory job performance at the time of discharge." *Kelepecz v. Child.'s Learning Ctrs. of Fairfield Cnty., Inc.,* No. 21-cv-136 (OAW), 2024 U.S. Dist. LEXIS 45939, at *19 (D. Conn. Mar. 15, 2024) (citing *Thornley v. Penton Publ. Inc,* 104 F.3d 26, 30 (2d Cir. 1997)). "The rationale…is that the employee must demonstrate that his performance warranted continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him . . . ." *Stein v. McGraw-Hill*, 782 F. Supp. 207, 211 (S.D.N.Y. 1992) (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)). "[C]ourts will rely on the evaluations the plaintiff received from his or her supervisors in determining satisfactory job performance." *Williams,* 2001 U.S. Dist. LEXIS 2904 at *14. Notably, "a plaintiff's subjective belief he is qualified will not suffice." *Hamilton v. Elrac, LLC,* No. 22-CV-10860 (PGG) (BCM), 2024 U.S. Dist. LEXIS 18199, at *14 (S.D.N.Y. Jan. 31, 2024).

In *McLee v. Chrysler Corp.,* 109 F.3d 130 (2d Cir. 1997), the court found that plaintiff McLee could not establish that his performance was satisfactory because he was deficient in 13 of 22 areas in his 120-day review.  Some of those deficiencies included "failure to submit audits and other paperwork on time" and "inability to solve operational problems."  *Id.* at 135.  Further and of relevance here, McLee did not dispute the majority of the supervisors' comments and offered excuses for his tardiness.  *Id.*

And, in *Williams*, the court reviewed Alliance's eight-page job description for the Operations Manager position and concluded that Williams was not qualified for the position. *Williams*, 2001 U.S. Dist. LEXIS 2904 at *14-15.  Plaintiff received two warning memos while employed which put her on notice of her deficiencies and her supervisors further warned her that she could be terminated if she did not cure these issues.  *Id.* at *15.  The court ultimately granted summary judgment in defendant's favor in part because plaintiff could not demonstrate she was qualified for the position.  *Id.* at *18.

Plaintiff has rated himself as exceeding expectations in several of the EPRs—but this is not enough to demonstrate he was qualified for the position.  *Hamilton*, 2024 U.S. Dist. LEXIS 18199 at *14.  Here, even viewing the evidence in the light most favorable to *pro se* Plaintiff, the undersigned finds that there are several reasons to support a conclusion that Plaintiff did not possess the basic qualifications for the job at the time of his termination.  *First*, Plaintiff does not offer any evidence of the criteria Arrow uses for the position he had been hired for (Network Security Engineer) or the position that he was fired from (Senior Infrastructure Engineer III). (*See generally* ECF No. 151); *cf Kelepecz,* 2024 U.S. Dist. LEXIS 45939 at *20 (finding that according to the submitted job description, plaintiff had the basic skills necessary to perform her duties as director of development which did not include specific technological skills as defendant

alleged).  Thus, the Court is unable to give credence to Plaintiff's assessments that he often exceeded expectations.  *Second* and like *McLee*, Plaintiff consistently received average evaluations which identified the same areas of improvement in 2011, 2012, and 2013 as well as his 2013 and 2014 PIPs.  (ECF No. 152 at ¶ 71.)  Further and similar to *Williams,* Plaintiff was on notice and even acknowledged that if he did not improve his performance, he would be terminated.  (*Id.* at ¶¶ 52, 107.)

Plaintiff's evaluations and subsequent failures to improve are extensive.  He has not created any issues of act as to those, leading to the inescapable conclusion that he was not qualified for his position at the time he was terminated.  No triable issues of fact have been articulated by Plaintiff, even construing his submissions in the most favorable light.

### 2.  **Prong Four:** *Inference of Discrimination*

Having found that Plaintiff was not qualified, the Court next turns to whether there is an inference of discrimination.  Plaintiff states that he was discriminated based on his national origin because (1) a co-worker named Robert Ragusa made dirty comments to him; (2) Russo compared him to another Hispanic employee; and (3) Russo mimicked his accent.  (ECF No. 152 at ¶ 142.)

To establish an inference of discrimination, a plaintiff can show disparate treatment, that is, when "the employer treated plaintiff less favorably than a similarly situated employee in all material respects outside his protected group."  *Memisevich v. St. Elizabeth's Med. Ctr.*, 443 F. Supp. 2d 276, 286 (N.D.N.Y. 2006).  The other employees must be "sufficiently similar to support at least a minimal inference that the difference of treatment may be attributable to discrimination."  *Anoop M. Tolani v. Carl C. Burnett Funeral Home, Inc.,* No. 20-CV-2169 (JS)(JMW), 2022 U.S. Dist. LEXIS 142024, at *28 (E.D.N.Y. Aug. 9, 2022).

An inference of discrimination can also arise from "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group" or "the sequence of events leading to the plaintiff's discharge." *Stewart v. City of New York,* No. 22-2775, 2023 U.S. App. LEXIS 28048 (2d Cir. Oct. 23, 2023) (citing *Littlejohn v. City of New York,* 795 F.3d 297, 312 (2d Cir. 2015)). "Actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus" can also support this prong. *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 91 (2d Cir. 1996). Courts consider the following factors when analyzing whether a comment is probative of discriminatory animus or a mere stray remark: "(1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark . . .; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process." *Schreiber v. Worldco, LLC,* 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004).

Plaintiff has not and cannot point to any similarly situated employees that were treated more favorably than he was. For example, he makes very attenuated assertions that certain employees submitted tardy timesheets but were not reprimanded; were allowed to go to Church before beginning their workday; and were able to take sick days off, communicate freely with executives, bring their work laptop to meetings, and receive more flexible task deadlines. (ECF No. 152 at ¶¶ 153-155). However, there is no indication that any of the employees had received similar comments in their EPRs or were placed on two PIPs. Further, Plaintiff submits timesheets for several other employees but failed to state what their positions are and whether their national origins (aside from the fact that they are "American") compare or contrast to Plaintiff's. (ECF No. 151-39) (timesheet data); *see Tolani*, 2022 U.S. Dist. LEXIS 142024 at

*28 (stating that comparators, or similarly situated employees of a difference race but treated more favorable, must be similar in in all material respects).  Perhaps more critical is the fact that he submits these hours worked to support his allegation that they too submitted late timesheets but were never disciplined.  However, Plaintiff fails to include any information of these employees' timesheet submission dates.  (*See generally id.*)

Further, none of the above circumstances described in *Stewart* or *Schreiber* are present here.  Plaintiff has not alleged that D'Alessandro, the author of the EPRs that were allegedly a pretext for his termination, made any discriminatory comments.  (*See* ECF No. 152 at ¶ 9) (stating that "D'Alessandro maliciously gave to Plaintiff [perverse rates] on [a] pretext basis in the 2013 and 2014 EPRs").  Indeed, Plaintiff admitted this in his deposition.  (Pltf. Dep. Tr. at 35) (Q: "And during that period of time when you reported to Mr. [D'Alessandro] at that point, were there any comments that he made to you that you believed related to your nat[ional] origin?" A: "No.").  Further, Ragusa—the employee that made the discriminatory comments— was not in a supervisory role to have made any impact on Plaintiff's continued employment with Arrow.  Finally, Plaintiff's own opposition alludes to Russo's mimicking because of his nasal congestion, *not* because of his Ecuadorian national origin.  (ECF No. 152 at ¶ 8.)  Even if the mimicking was based on Plaintiff's Ecuadorian accent, "courts have found the mimicking of a plaintiff's accent on a random occasion insufficient to support an inference of discrimination under the *McDonnell* framework."  *Palak v. St. Francis Hosp.*, No. 14-CV-4383, 2015 U.S. Dist. LEXIS 76511, at *29 (E.D.N.Y. June 12, 2015).  As a result, these statements are insufficient to establish a discriminatory intent under Title VII.  *See Salas v. New York City Dep't of Investigation,* 298 F. Supp. 3d 676, 687 (S.D.N.Y. 2018) (finding no inference of discrimination pled where plaintiff did not allege that her supervisors or other management made any statements

about her religion or disability, or statements indicating such characteristics played a role in decisions to give plaintiff a warning or deny her a pay raise); *Abada v. Delta Air Lines, Inc.*, Nos. 19-CV-3903 (KAM) (VMS); 19-CV-3904 (KAM) (VMS); 19-CV-3962 (KAM) (VMS), 2020 WL 7481326, at *4 (E.D.N.Y. Dec. 18, 2020) (finding that although employees' derogatory remarks were disturbing and appeared to "reflect a significant animus on the part of certain . . . employees[,]" plaintiff failed to allege that the specific employees were the individuals involved in the termination of plaintiffs).

Perhaps most notable is that Plaintiff never reported these incidents to HR and did not come forward with any supporting information or documentation that he did in fact report them. (ECF No. 152 at ¶ 143). Plaintiff's mere tacking the word of "discrimination" here falls far short of the mark to support a claim. *See Williams,* 2001 U.S. Dist. LEXIS 2904 at *17 (finding that nothing in the record linked the supervisor's treatment of plaintiff to her race); *Kajoshaj v. N.Y.C. Dept. of Educ.*, 543 Fed. App'x. 11, 14 (2d Cir. 2013) (dismissing a complaint that repeatedly asserted defendants took certain actions based on plaintiffs' religion and national origin, because complaint was devoid of factual allegations that would reasonably give rise to such an inference, as there was nothing asserting that any defendant referenced religion or national origin); *see also Little v. State of N.Y.*, No. 96-CV-5132 (SJ), 1998 WL 306545, at *6 (E.D.N.Y. June 8, 1998) ("It is well settled that a plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn.").

Finally, all three comments occurred remotely in time, namely, months to years prior to Plaintiff's termination on January 8, 2015. First, Ragusa's comments occurred in 2005, second, Russo's comparison comment occurred in 2010, and the third incident's occurrence is unknown.

24

(ECF No. 152 at ¶ 142.)  Courts in this Circuit have found that such comments or circumstances are insufficient to establish an inference of discriminatory intent.  *See Hasemann v. United Parcel Serv. of Am., Inc*., No. 11-CV-554, 2013 U.S. Dist. LEXIS 25704, 2013 WL 696424, at *7 (D. Conn. Feb. 26, 2013) ("Comments too remote in time and context cannot support an inference of discriminatory intent."); *Dotson v. New York State Workers Comp. Bd.,* No. 16-CV-0580 (MAD) (CFH), 2018 U.S. Dist. LEXIS 35828, at *15 (N.D.N.Y. Mar. 6, 2018) (finding the alleged discriminatory statement occurred seventeen years prior to the employment actions at issue and were thus too remote in time).

Therefore, because Plaintiff fails to demonstrate an inference of discriminatory intent, his Title VII claim based on national origin fails.

### 3. Defendant Has Established Non-Pretextual Reasons for the Termination and Plaintiff Has Not Controverted This Evidence

Even if the District Judge disagrees with the undersigned and finds that Plaintiff has established prongs two and four for his Title VII claim, Defendant has fully supported its non-pre-textual reasons for terminating Plaintiff based on the decline in his work performance over a series of years.  This was evidenced in his 2011, 2012, 2013 EPRs, and his Final Written Warning Letter issued on October 28, 2014.  (ECF No. 152 at ¶ 71); (*see also* ECF Nos. 147-7, 147-8, 147-9, 147-11, 147-13, 147-16, and 147-21) (EPRs, PIPs, final warning letter).  Further, Defendant invested time into improving Plaintiff's performance by placing him on not one, but two PIPs on May 6, 2013 and March 27, 2014 to ensure he would be able to get back on track. The EPRs and PIPs detailed the same recurring issues: failure to complete administrative tasks such as CA Service Desk tickets and timesheets, inability to follow management's directions, and failure to meet deadlines.  (ECF No. 152 at ¶¶ 44, 72.)  However, Plaintiff failed to

demonstrate progress and his supervisors were often faced with Plaintiff's excuses as to why he was unable to complete tasks as directed.

Indeed, the court in *Kennebrew v. N.Y. City Hous. Auth.*, No. 01-cv-1654 (JSR) (AJP), 2022 U.S. Dist. LEXIS 3038, at *51 (S.D.N.Y. Feb. 26, 2002) found that plaintiff's poor work performance which included "unsatisfactory Quarterly Evaluation Reports and four counseling memos" was a legitimate non-discriminatory reason for firing plaintiff.  Like the court in *Kennebrew,* the court here finds that it cannot "second-guess an employer's non-discriminatory business decisions" to fire plaintiff.  *Id.; see also Young v. Ltd. Brands,* No. 11-cv-2927 (KBF), 2013 U.S. Dist. LEXIS 144112, at *25 (S.D.N.Y. Sept. 25, 2013) (finding that plaintiff's history of poor performance and violation of supervisory instructions was a legitimate non-pretextual reason for her termination and her claim under the Age Discrimination in Employment Act failed); *Govori v. Goat Fifty, L.L.C.,* 519 Fed. Appx. 732, 734 (2d Cir. 2013) (noting that plaintiff's "sub-par customer service" was a legitimate reason for her termination).

With regard to the CA Service Desk Tickets specifically, in March 2014, D'Alessandro emailed Plaintiff about his failure to address CA tickets and Plaintiff responded that there were "non-stop, time consuming important requests that needed attention." (ECF No. 147-14).  In August 2014, D'Alessandro again emailed Plaintiff about 81 CA Service Desk Tickets that he had opened.  (ECF No. 147-17.)  He attributed the delay in completing these tickets to his multitasking on another project.  (*Id.*)  Finally, on December 2, 2014, Plaintiff ignored several emails between D'Alessandro and Russo about prioritizing CA tickets.  (ECF No. 147-24) (CA Service Desk Ticket emails).  Although Plaintiff states some emails either did not have the "priority label," were not sent to a certain inbox for escalated tasks, or were otherwise sent when he was away from his computer, D'Alessandro spoke with Plaintiff earlier that morning and

informed him of the importance of closing out the CA Tickets for the day.  (*See id.* at 2.)  (D'Alessandro: "In our conversation this morning we agreed that the tickets should be your priority today and I gave you guidance on the pattern of issues we experienced yesterday to help you efficiently work on these tickets." Plaintiff: "Understood.").  Notwithstanding the emails to prioritize this task, Plaintiff only began working on the CA Tickets later that evening at 7:50 PM.  (ECF No. 152 at ¶ 127.)

While commendable that Plaintiff would volunteer for projects that were complex, he often missed deadlines and his manager would often have to follow up with him via email for a status update.  (*See e.g.,* ECF No. 147-12 at 2-3) (emails between Plaintiff, D'Alessandro and Russo from September 5, 2013).  Emails between D'Alessandro and Russo in October 2014 are particularly relevant here:

> Email from Russo to Corral on October 22, 2014 at 9:58 AM: "I understand that you are remote at this point working with Mobileiron. I had a deliverable yesterday to provide an update on this. My ask to Rick was since you had the device to work with Dave to facilitate the test before the end of the day. Since that did not happen, I need you to please test this ASAP with Dave this morning.

> Email from D'Alessandro to Corral on October 22, 2014 at 10:11 AM: "I called you yesterday around 3pm and asked you to power on the Widows test device so Dave can apply the test policy. This was not a time consuming request and should have easily been accomplished in parallel to your Sentry build activity. It wasn't until 9pm last night after a reminder email that you confirmed it was ready to test."

(ECF No. 147-20.)

Further, Plaintiff repeatedly claims that he worked more hours than any other employee reporting to D'Alessandro and Russo.  (ECF No. 152 at ¶ 120.)  But simply working more hours does not equate to efficiency—in fact, they indicate that he was *inefficient* at his job.  On many occasions, he also offered excuses for failure to perform and failed to take accountability.  (*Id.* at ¶¶ 24, 34, 40, 64, 69.)

Upon Plaintiff's continued failure to improve despite his chances to do so and, most significantly, the events on December 2, 2014, D'Alessandro emailed HR stating that he wanted to move forward with his recommendation to terminate Plaintiff.  (ECF No. 147-25 at 2.)  HR, *a neutral third-party*, reviewed Plaintiff's disciplinary history and concurred in the decision to terminate Plaintiff on January 8, 2015.

In short, Plaintiff failed to come forward on his burden to put forth evidence demonstrating that his termination was pretextual.  Failure to do so is fatal to his Title VII claim. *See Jimenez v. Delta Airlines,* No. 18-CV-6448 (WFK) (VMS), 2021 U.S. Dist. LEXIS 233004, at *12 (E.D.N.Y. Oct. 29, 2021) (finding that plaintiff did not rebut defendant's non-pretextual reason for his termination and dismissing plaintiff's disparate treatment claim); *Kemmott v. N.Y. City Health & Hosps. Corp.,* No. 19-CV-989 (RPK) (ST), 2022 U.S. Dist. LEXIS 173654, at *17-18 (E.D.N.Y. Sept. 26, 2022) (granting summary judgment on plaintiff's religious discrimination claim because plaintiff proffered no reasons for the court to find that the termination based on her insubordination and interpersonal issues was pretextual).

Also significant is that Plaintiff fails to refute 115 out of the 185 statements in Defendant's 56.1 statement of undisputed material facts.  (*See* ECF No. 152 at ¶¶ 25-33, 39-84, 135-149, 154-185.)  Relatedly, Plaintiff either makes blanket statements without support or cites to documents not turned over in discovery.[12]  (*See e.g., id.* at ¶¶ 3, 8, 34, 91, 112) (examples in which Plaintiff makes blanket statements without support); (*see id.* at ¶¶ 12, 87, 107, 153) (examples in which Plaintiff cites documents that were not exchanged).

---

[12] In fact, Defendant states that Plaintiff improperly downloaded his email server to a personal storage device and has not returned these files to Defendant.  Defendant objects to their admissibility.  (ECF No. 152 at ¶ 12 n.3.)

Thus, the undersigned finds that Plaintiff has failed to establish his Title VII discrimination claim and even if he did, Defendant has provided a legitimate, non-pretext reason for his termination.

**B. Plaintiff's Claim of Discrimination under the ADA**

Next, Plaintiff alleges he was discriminated based on his purported disability of breathing problems, acid reflux and nasal congestion.

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). For a plaintiff to prevail on a claim under the ADA for discrimination, "a plaintiff must demonstrate that (1) []he is a qualified individual with a disability, (2) the defendant is subject to the ADA, and (3) []he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of h[is] disability." *GLD v. City of New York*, No. 19-cv-4314 (AT), 2020 U.S. Dist. LEXIS 158432, at *5-6 (S.D.N.Y. Aug. 27, 2020) (citing *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)). Here, the second element is undisputed, therefore, the Court analyzes whether there is a genuine dispute of material facts concerning the first and third elements.

Under the ADA, a disability is defined as: "(1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such an impairment, or (3) being regarding as having such an impairment." *Quintero v. Rite Aid of N.Y., Inc*., No. 09-cv-6084 (JLC), 2011 U.S. Dist. LEXIS 130920, at *24 (S.D.N.Y. Nov. 10, 2011).

29

Plaintiff cannot establish any of the foregoing circumstances for his ADA claim.   There was only a single episode in which he was unable to address a CA Service Desk Ticket in July 2014 because of his acid reflux.  (ECF No. 152 at ¶ 159.)  However, he had not requested any accommodations for this "disability."  (*Id*. at ¶ 160.); *see Floden v. Des Moines Indep. Cmty. Sch. Dist.*, No. 07-cv-00177 (JAJ), 2008 U.S. Dist. LEXIS 65982, at *17 (S.D. Iowa Aug. 27, 2008) (granting defendant's motion for summary judgment on plaintiff's claim in part because plaintiff never asked defendant "for anything that could have helped [her] do [her] job better because of problems [she was] having with asthma or acid reflux").   Indeed, this was the first time that Arrow was apprised that his acid reflux had any impact on his job.  (ECF No. 152 at ¶ 161.)  Aside from the incident in July 2014, Plaintiff has failed to show that his acid reflux "substantially limits" any major life activity.  *See* 42 U.S.C. § 12102(1); *see also Szabo v. City of New York,* No. 16-cv-4268 (LAP), 2017 U.S. Dist. LEXIS 115082, at *12-13 (S.D.N.Y. July 21, 2017) (finding that plaintiff that alleged acid reflux as a disability among others was unable to show that she was "a qualified person with a disability because she has failed to allege facts showing that any of her alleged conditions limited a major life activity"); *Fisher v. Walt Disney World Swan & Dolphin*, No. 09-cv-719-Orl-31 (DAB), 2010 U.S. Dist. LEXIS 118272, at *20 (M.D. Fla. Oct. 28, 2010) ("Plaintiff is unable to make out a *prima facie* case under the ADA. Although Plaintiff alleges that he suffers from "acid reflux and ulcers," he fails to allege, and the evidence does not substantiate, that either of these conditions substantially limited a major life activity. Rather, the record evidence indicates that Plaintiff was able to perform all normal daily functions and was able to work at all times.").  And, similarly absent from Plaintiff's counterstatement to the 56.1 statement is any indication that his nasal congestion impacted his

life to qualify as a disability.  Thus, Plaintiff fails to satisfy the first element of his ADA discrimination claim for either claimed disability.

Nor can Plaintiff establish that he was discriminated against *because of* his disability. And even if Russo's alleged mimicking of his nasal congestion described above was discriminatory (ECF No. 152 at ¶ 8), "[a] single comment is insufficient to present a triable issue as to discriminatory motive."  *Herron v. New York City Transit*, No. 15-CV-4842 (EK) (CLP), 2022 U.S. Dist. LEXIS 63238, at *23 (E.D.N.Y. Apr. 5, 2022) (citing *Benson v. Fam. Dollar Operations, Inc*., 755 F. App'x 52, 56 (2d Cir. 2018)).  And as Defendant points out, Plaintiff had been receiving negative comments in his EPRs and PIPs as early as 2011 and he disclosed his acid reflux to HR in July 2014.  Thus, D'Alessandro could not discriminate against Plaintiff for a disability that was never disclosed to him.

Finally, Plaintiff never alleged that he was terminated because of his disability.  (ECF No. 152 at ¶ 146.)  *See Atkins v. Cnty. of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003) (explaining that where there is no disparate treatment, there is no claim for discrimination under the ADA); *Mines v. City of New York/DHS*, No. 11-CV-7886 (JGK), 2013 U.S. Dist. LEXIS 157782, at *31 (S.D.N.Y. Nov. 1, 2013) (finding that plaintiff could not establish her ADA discrimination claim because she failed to show that her termination "occurred under circumstances giving rise to an inference of discriminatory intent"); *Schlosser v. Elzea*, No. 19-cv-1380 (SRU), 2020 U.S. Dist. LEXIS 30910, at *10-12 (D. Conn Feb. 24, 2020) (discussing that plaintiff has failed to allege any facts suggesting that he was discriminated against for his disability regarding his mental health).  And, as with his Title VII claim, there was a legitimate, non-pretextual reason for his termination.

For these reasons, Plaintiff's ADA claim fails.

## C.  Plaintiff's Failure to Accommodate Claim Under the ADA

Plaintiff claims that Defendant failed to accommodate his various requests to take his son to the doctor's office for an appointment, for Plaintiff's medical procedure on his hand, and for his back pain.  (ECF No. 152 at ¶¶ 162, 172, 176.)

"An employer may . . . violate the ADA by failing to provide a reasonable accommodation."  *McMillan v. City of N.Y.*, 711 F.3d 120, 125 (2d Cir. 2013).  "A plaintiff states a *prima facie* failure to accommodate claim by demonstrating that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *Id.* at 125–26.  Once a plaintiff established a *prima facie* case, the burden shifts to the defendant employer to demonstrate that the plaintiff's proposed accommodation would result in an undue hardship. *Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 360 (E.D.N.Y. 2012).

To show that a defendant refused to provide reasonable accommodations, a plaintiff "bears only a burden of production."  *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995) (citing *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991)).  The Second Circuit has made clear that this burden "is not a heavy one" and that "[i]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits."  *Id.*  The issue of whether an accommodation is reasonable is normally a question of fact best left for determination by jury.  *See Canales–Jacobs v. N.Y. State Off. of Ct. Admin.*, 640 F. Supp. 2d 482, 500 (S.D.N.Y. 2009) (citing *Borkowski*, 63 F.3d at 138).  Although the ADA "does not require the employer to provide every accommodation a disabled employee may request," it does require that "the accommodation provided is reasonable."  *D'Eredita v. ITT*

*Corp.*, 370 F. App'x 139, 141 (2d Cir. 2010) (summary order) (internal quotation marks and citation omitted).  The phrase "reasonable accommodation" is defined as "[m]odifications or adjustments to the work environment . . . that enable an individual with a disability who is qualified to perform the essential functions of that position" as well as "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. §§ 1630.2(o)(1)(ii)-(iii).

*First and foremost,* although the undersigned has already found that Plaintiff's congestion and acid reflux do not constitute disabilities, the undersigned also notes that none of the alleged accommodations were for Plaintiff's congestion or acid reflux.  Notably, on September 3, 2014, Plaintiff asked for work changes due to his disability.  (ECF No. 1 at 11.)  He requested (i) clean air; (2) to reduce the number of work alerts he received at night to minimize sleep disruption; and (3) to allow one to two hours to alleviate acid reflux, sinus, and asthma symptoms.  (*Id.*)  As a result of his request, Plaintiff received FMLA leave for one day a week for the next year.  (*Id.*); (*see also* ECF No. 1 at 15) (FMLA approval letter).  This accommodation is not at issue here.

Nonetheless, Defendant accommodated all of Plaintiff's above requests.  When Plaintiff requested time off to take his son to the doctor, D'Alessandro referred him to HR.  It was then *Plaintiff's* burden to go to HR to request the appropriate accommodations.  *See Bost v. Nassau Cnty. Dep't of Soc. Servs.,* No. 22-2547, 2023 U.S. App. LEXIS 25802, at *4 (2d Cir. Sept. 29, 2023) (finding that plaintiff failed to follow up on her accommodation request with her employer because she did not provide adequate documentation).  However, notwithstanding this directive, Plaintiff complained that Defendant did not grant the accommodation and Plaintiff cancelled the

appointment.  (ECF No. 152 at ¶¶ 162, 164.)  Notably, Plaintiff does not allege that D'Alessandro denied him the accommodation.

Regarding his request to take off for his medical procedure in September 2015 and subsequently work from home the remainder of the workday.  D'Alessandro granted this request.  (*Id.* at ¶¶ 173-74.)  However, Plaintiff took it upon himself to begin his workday when he returned from the surgery—an accommodation that D'Alessandro did not approve.  D'Alessandro asked Plaintiff to correct his timesheet multiple times to reflect the hours worked during business hours only.  (*See id.* at ¶ 175.)

Finally, on January 2, 2015, he stated he had back pain and could not get to work and he was granted the option to drive into work or take a sick day.  (*Id.* at ¶ 176.)  Even though D'Alessandro told him to work from home that day, Plaintiff elected to work from home.  (*Id.* at ¶ 178.)

Accordingly, because all accommodations were provided, Plaintiff cannot succeed on his failure to accommodate claim.  *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 524 (E.D.N.Y. 2019) ("Because [the] [d]efendants did attempt to, and did, accommodate [the] [p]laintiff, she fails to state a plausible failure to accommodate claim under the ADA.").

### D.  Plaintiff's Retaliation Claim Under Title VII and the ADA

Plaintiff claims he was retaliated against and ultimately fired after filing a complaint against Russo in 2014.  Title VII of the Civil Rights Act of 1964 "prohibits an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation."  *Burlington Northern and Sante Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e—3(a)). Under this section of Title VII, referred to

as the antiretaliation provision, "discriminate against" has been interpreted to mean that an "employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57. Similarly, the ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by this [Act]." 42 U.S.C. § 12203(a).

Unlawful retaliation claims under Title VII are analyzed using the burden-shifting *McDonnell Douglas* framework. *Eustache v. Home Depot U.S.A., Inc.*, No. 13-CV-42L (SJF)(AKT), 2014 WL 4374588, at *31 (E.D.N.Y. Sep. 2, 2014) *adopting report and recommendation, aff'd*, 621 Fed. App'x. 86 (2d Cir. 2015) (citation omitted); *Brown v. Northrop Grumman Corp.*, No. 12-CV-1488 (JS) (GRB), 2014 WL 4175795, at *5 (E.D.N.Y. Aug. 19, 2014) (citation omitted).

The elements for retaliation under Title VII and ADA are the same. *Rajcoomar v. Bd. of Educ.,* No. 16-CV-1682 (VB), 2017 U.S. Dist. LEXIS 35813, at *15 (S.D.N.Y. Mar. 13, 2017). To make out a *prima facie* retaliation claim under Title VII or the ADA, a plaintiff must demonstrate that "(1) []he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). "To prove the required causal link, [plaintiff] must establish that the employer's retaliatory motive was a but-for cause of the adverse action." *Husser v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 253, 271-72 (E.D.N.Y. 2015) (adopting report and recommendation) (internal quotation marks and citations omitted). When determining whether summary judgment is appropriate, the court must only determine "whether proffered admissible

evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id.* at 272 (citation omitted).

Here, Defendant only seems to dispute whether the activity was protected under Title VII or the ADA and whether there was a causal connection between the complaint and his termination. The Court analyzes both elements below.

### 1. Protected Activity

Plaintiff seems to argue that his email to Russo, D'Alessandro, and others regarding the timeline for a particular project was a protected activity. In an email on January 28, 2014, he states: "It is interesting though that Rob[ert Russo's] timeline is very generous with a TBD for John [Butera's] tasks who need access to resources…but very tight for me that need access to a subset of the same resources." (ECF No. 147-27 at 2.)

"'Protected activity' consists of filing a formal or informal complaint, including an EEOC charge, challenging discriminatory conduct." *Separ v. Cty. of Nassau*, No. 21-CV-00010 (DRH) (JMW, 2022 U.S. Dist. LEXIS 17394, at *20 (E.D.N.Y. Jan. 28, 2022).

Here, Plaintiff's email does not constitute a protected activity. The email described made no mention of discrimination nor did D'Alessandro (the decisionmaker in this instance) make any discriminatory remarks toward Plaintiff. (ECF No. 152 at 135); *see Murphy v. City of Newburgh*, 785 F. App'x 900, 902 (2d Cir. 2019) (plaintiff's complaint failed to qualify as a "protected activity" because she did not allege that her supervisor "treated her poorly based on her gender or any other protected class status"); *Romano v. A360 Media, LLC,* No. 20-cv-08988 (LTS) (OTW)*, 2023 U.S. Dist. LEXIS 10355, at *32-33 (S.D.N.Y. Jan. 20, 2023) (finding that a "general complaint about management style is insufficient to qualify as protected activity"); *cf. Salas v. New York City Dep't of Investigation,* 298 F. Supp. 3d 676, 686-87 (S.D.N.Y. 2018)

(finding that plaintiff pled a plausible ADA retaliation claim when she complained that personnel mocked her stutter which led to the denial of her raise less than three months later).[13]

## 2. Causal Connection Between the Complaint and Plaintiff's Termination

Plaintiff's retaliation claim also fails for failure to demonstrate a causal connection between the 2014 complaint and his termination in 2015. *First,* courts in this Circuit tend to look at the temporal proximity or other connections between the protected activity, here the filing of the purported complaint, and the alleged acts of discrimination or retaliation. *See Fukelman v. Delta Air Lines*, No. 18-CV-2 (PKC) (PK), 2020 U.S. Dist. LEXIS 66410, at *58 (E.D.N.Y. Apr. 13, 2020). That is, the closer in time and more evident the connection is between the filing of the complaint and the alleged termination, the more a court is likely to find that plaintiff pled a credible retaliation claim. *Dhar v. City of N.Y.*, 655 Fed. App'x. 864, 865-66 (2d Cir. 2016) (Summary Order) (noting that although "temporal proximity can support an inference of retaliation for purposes of establishing a prima facie case, the proximity must be very close") (internal quotation marks and citation omitted).

Here, Plaintiff's complaint was made on January 28, 2014 about a deadline that *Russo* gave and Plaintiff's termination occurred a year later on January 8, 2015 stemming from a recommendation from *D'Alessandro.* Courts have found that the time frame of more than a couple of months between the protected activity and the termination to be too attenuated to constitute causation. *See Chang v. Safe Horizons*, 254 Fed. App'x. 838, 839 (2d Cir. 2007) (Summary Order) (finding that termination occurring almost one year after complaint of discrimination undermined any causal nexus based on temporal proximity); *Yarde v. Good*

---

[13] To the extent that Plaintiff complains that his complaint to HR about Russo's behavior was a "protected activity," this too fails for failure to allege any discriminatory conduct. In that complaint, Plaintiff merely stated that Russo's conduct was inappropriate and was solely based on Plaintiff's work performance and not his national origin or disability. (Pltf's Dep. Tr. at 12-13); (ECF No. 147-10 at 2.)

*Samaritan Hosp.,* 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation . . . six months between protected activity and discharge is well beyond the time frame for inferring retaliatory causation" (internal citation and citation omitted)); *Chamberlin v. Principi,* 247 Fed. App'x 251, 254 (2d Cir. 2007) (five month gap between protected activity and alleged adverse job action insufficient to show a causal connection); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and the alleged act of retaliation.").

*Second,* with respect to the causal connection, a plaintiff establishes a causal connection between the protected activity and the adverse employment action either by "(1) indirectly [showing] that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Liang v Café Spice SB, Inc.*, 911 F. Supp. 2d 184, 211 (E.D.N.Y. 2012). A "plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Toombs v. N.Y.C. Hous. Auth.*, 830 F. App'x 665, 668 (2d Cir. 2020) (citing *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013)).

Here, there is ample support to demonstrate that Plaintiff's poor performance had been an ongoing problem long before his termination. His performance was supported by multiple EPRs, PIPs, and a Final Written Warning dating as far back as 2011. Further, and as mentioned above, Plaintiff failed to allege any discriminatory treatment in the 2014 complaint based on his alleged disability or national origin. *See Holcomb v. Optumhealth, Inc.,* No. 20-cv-9043 (AKH), 2023

U.S. Dist. LEXIS 178830, at *4 (S.D.N.Y. Oct. 4, 2023) (granting defendants' motion for summary judgment where plaintiff "failed to offer any evidence that her termination was a result of her complaint regarding race discrimination").  Therefore, Plaintiff's generalized assertion that the 2014 complaint about project deadlines impacted his termination does not hold any water.  *See DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (finding that while considering summary judgment the court must view the evidence in the light most favorable to plaintiff, a "court cannot credit a plaintiff's merely speculative or conclusory assertions") (internal quotation marks and citations omitted).

Accordingly, Plaintiff's claim for retaliation fails for failure to establish a protected activity and a causal connection.

## CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that Defendant's motion for summary judgment (ECF No. 145) be **granted** in its entirety.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on Defendant's counsel.  Defendant is directed to serve a copy of this Report and Recommendation upon *pro se* Plaintiff and file proof of service within two business days of the date of this Report and Recommendation.  Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report.  28 U.S.C. § 636(b)(1) (2006 & Supp. 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the

District Court or the Court of Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (summary order) (same).

Dated:  Central Islip, New York.
        May 9, 2024

                        **RESPECTFULLY RECOMMENDED**,


                        /S/ ***James M. Wicks***
                        JAMES M. WICKS
                        United States Magistrate Judge